Filed 7/30/21  P. v. Fay CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B299385 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA146912) |
| v. | |
| TYRE JAMES FAY, | ORDER MODIFYING OPINION (NO CHANGE IN JUDGMENT) |
| Defendant and Appellant. | |

THE COURT:

IT IS ORDERED that the opinion filed on July 19, 2021 be modified as follows:

On page 17, at the end of the last sentence of section A, add the following footnote 7, which will requiring renumbering of all subsequent footnotes:

7    We thus reject Fay's contention that defense counsel's failure to move to dismiss the charges based on double jeopardy and collateral estoppel constituted ineffective assistance of counsel.  (See *People v. Anderson* (2001) 25 Cal.4th 543, 587 [defense counsel does not provide ineffective assistance of counsel

by declining to proffer futile objections]; *People v. Price* (1991) 1 Cal.4th 324, 387 [counsel's failure to make an unmeritorious motion is not ineffective assistance].)

There is no change in the judgment.  The petition for rehearing is denied.

---

PERLUSS, P. J.             SEGAL, J.             McCORMICK, J.*

---

*     Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 7/19/21  P. v. Fay CA2/7 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B299385 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA146912) |
| v. | |
| TYRE JAMES FAY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Pat Connolly, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

## INTRODUCTION

The People charged Tyre James Fay with attempting to murder Vincente Villamara, Jeimy Hernandez, and Allison Hernandez by shooting at Villamara's car.[1]  A jury acquitted Fay of two counts of assault with a semiautomatic firearm, and could not reach verdicts on a third count of assault with a semiautomatic firearm, three counts of attempted murder, and one count of shooting at an occupied vehicle.  The People refiled the five hung counts and added gang allegations.  The second jury convicted Fay on the retried counts and found true the gang and other allegations.

Fay argues double jeopardy and collateral estoppel barred the retrial on the hung counts because in acquitting Fay on two counts of assault with a semiautomatic firearm, the first jury necessarily found Fay did not shoot at Villamara's car.  Fay also argues the trial court erred in denying his motion to dismiss the information based on vindictive prosecution.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Amended Complaint in Case Number TA142782*

In April 2017 the Los Angeles County District Attorney's Office filed an amended felony complaint in case number TA142782 charging Fay with one count of shooting at an occupied vehicle in violation of Penal Code[2] section 246 (count 1) and four counts of assault with a firearm in violation of section 245, subdivision (a)(2) (counts 2, 3, 4 and 5).  As to counts 2 through 5, the complaint alleged Fay personally used a firearm within the

---

[1]    For clarity, we refer to Jeimy Hernandez by her last name and Allison Hernandez by her first name.

[2]    All further statutory references are to the Penal Code.

meaning of section 12022.5, subdivision (a). Fay pleaded no contest to counts 1 and 5 and the court sentenced Fay to a state prison term of six years eight months.

Fay subsequently moved to withdraw his plea and the parties stipulated Fay could do so. The trial court accepted the stipulation and permitted Fay to withdraw his plea.

Following a preliminary hearing, the trial court granted the People's request to dismiss the complaint in case number TA142782. The People filed a new complaint in case number TA145605 to add charges related to Villamara, Hernandez, and Allison, who had been newly-located living out of state.

B.     *The Information and Trial in Case Number TA145605*

The information in case number TA145605 charged Fay with four counts of attempted willful, deliberate, and premeditated murder in violation of sections 664 and 187, subdivision (a) (counts 1, 2, 3 and 4), two counts of shooting at an occupied vehicle in violation of section 246 (counts 5 and 6), one count of assault with a firearm in violation of section 245, subdivision (a)(2) (count 7), and three counts of assault with a semiautomatic firearm in violation of section 245, subdivision (b) (counts 8, 9 and 10).[3] As to counts 1 through 4, the information alleged Fay personally used and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (b) and (c). As to counts 1 and 5, the information alleged Fay personally and intentionally

---

[3]     Counts 1, 5 and 7 related to a second shooting that occurred shortly after the shooting at issue in this appeal. Counts 2 and 8 related to Villamara, counts 3 and 9 to Hernandez, and counts 4 and 10 to Allison. Count 6 related to the shooting of Villamara's car.

discharged a firearm causing great bodily injury or death within the meaning of section 12022.53, subdivision (d). As to counts 5 through 10, the information alleged Fay personally used a firearm within the meaning of section 12022.5, subdivision (a). Fay pleaded not guilty to the charges and denied the special allegations.

The trial court granted the People's motion to dismiss counts 1, 5 and 7. After a trial on the remaining counts, the jury acquitted Fay of assaulting Hernandez and Allison with a semiautomatic firearm (counts 9 and 10), and could not reach verdicts on the three attempted murder counts, the count of shooting at an occupied vehicle, and the count of assaulting Villamara with a semiautomatic firearm (counts 2, 3, 4, 6 and 8). The trial court declared a mistrial on the hung counts.

C.    *The Information in Case Number TA146912*

On September 7, 2018 the trial court granted the People's motion to dismiss the hung counts. The People refiled those charges in case number TA146912.

The information in case number TA146912 charged Fay with three counts of attempted willful, deliberate, and premeditated murder in violation of sections 664 and 187, subdivision (a) (counts 1, 2 and 3), one count of shooting at an occupied motor vehicle in violation of section 246 (count 4), and one count of assaulting Villamara with a semiautomatic firearm in violation of section 245, subdivision (b) (count 5). As to counts 1 through 4, the information alleged Fay personally used and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (b) and (c). As to count 5, the information alleged Fay personally used a firearm within the meaning of section 12022.5, subdivision (a). The information further alleged Fay committed

4

the offenses for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members within the meaning of section 186.22, subdivision (b)(4) (counts 1, 2, 3 and 4), and section 186.22, subdivision (b)(1)(C) (count 5).  Fay pleaded not guilty to the charges and denied the special allegations.

D.    *The Evidence at Trial*

    1.    *The shooting*

    On March 16, 2017 at approximately 8:00 p.m. Villamara was driving his girlfriend Hernandez and her one-year-old daughter Allison to Hernandez's home on South Ward Avenue in Compton.  Hernandez sat in the front passenger seat, and Allison rode in the back seat.  Villamara's car was black, and had paper license plates and dark tinted windows.  As Villamara drove down Myrrh Street, which crosses South Ward Avenue, he missed the turn onto South Ward Avenue.  Villamara made a U-turn in the middle of the next block to drive back towards South Ward Avenue.

    As Villamara drove back down Myrrh Street toward the intersection with South Ward Avenue, his headlights illuminated three people standing outside a house on the corner of Myrrh Street and South Ward Avenue.  One of the individuals pulled out a handgun and shot several times at Villamara's car while standing 15 to 18 feet from the passenger side of the car.  The bullets struck the windshield, roof, and passenger side door.  Villamara testified he "just took off from the scene because [he] was feeling dead. . . . [He] left in shock."  Hernandez testified she immediately "turned to see [her] daughter," who was unharmed.  Villamara drove away, and Hernandez called 911.

Los Angeles County Deputy Sheriff Jose Sandoval-Mendoza responded to the shooting scene in one to two minutes. Deputy Sandoval-Mendoza located a trail of nine expended shell casings on the northeast corner of the intersection leading from the sidewalk to the front door of a residence on South Ward Avenue. Deputies established a perimeter around the house and, using a loudspeaker, ordered anyone inside the house to come out. Four individuals including Fay emerged from the house. Deputies detained all four individuals, handcuffed them, and placed them in a patrol car.

Deputies searched the house and recovered two firearms: a loaded, nine-millimeter, semiautomatic Ruger firearm containing 17 rounds of ammunition, and an unloaded, nine-millimeter, semiautomatic Heckler & Koch firearm. Ballistics testing showed the Heckler & Koch firearm had discharged all nine of the shell casings recovered from outside the house.

A deputy who responded to Hernandez's 911 call described Hernandez as "hysterical" and Villamara as "upset, nervous, [and] crying." Deputies brought Villamara and Hernandez to the house for a field show-up approximately 30 minutes after the shooting. Villamara and Hernandez both identified Fay as the shooter. Before the field show-up, Hernandez told deputies the shooter wore black pants and a white T-shirt with an emblem, either red or burgundy, on the left breast pocket. When deputies detained Fay outside the house, Fay was wearing black pants and a white T-shirt with a red emblem on the left breast pocket. In addition, Hernandez testified at trial that she had seen Fay in the neighborhood in front of her house "around 50 times" before the shooting.

Approximately three hours after the shooting, deputies took swabs from Fay's hands and those of his companions to test for the

presence of gunshot residue. The results of the gunshot residue tests showed Fay and two of the others had particles consistent with gunshot residue on their hands. A sheriff's department criminalist testified that the presence of gunshot residue on an individual shows that the person either fired a gun or was in the vicinity of a gun when it was fired. The criminalist acknowledged that gunshot residue can transfer from clothing to a person's hands after a shooting.

Gary Cooper, a defense investigator, photographed the intersection where the shooting occurred at 5:00 a.m. in an effort to depict the lighting conditions at the time of the shooting. Cooper testified there was one streetlight at the intersection. Cooper also placed his car where Villamara's car had been, and he testified that his car headlights "illuminate[d], in some manner, the front yard and the side yard" of the house where deputies arrested Fay.

2. *The gang expert evidence*

The People introduced evidence Fay had admitted membership in the Ward Lane Compton Crips gang. The People's gang expert, Los Angeles County Deputy Sheriff Jennifer Strollo, testified the Ward Lane Compton Crips is a criminal street gang with primary activities including assaults with deadly weapons, firearm possession, robbery and burglary, a common sign, and a claimed territory.[4]

Deputy Strollo testified that gang members commit crimes to enhance their reputations in the gang and to create fear and intimidation in the community and in rival gangs. She explained

---

[4] The People also introduced evidence of two predicate gang offenses.

7

that creating fear and intimidation in the community reduces the likelihood crimes will be reported to the police and witnesses will testify against gang members in court.

Deputy Strollo stated the shooting occurred in the center of the Ward Lane Compton Crips' territory. Strollo knew from her work as a gang detective that the house where the deputies arrested Fay was "a known hangout for Ward Lane Compton Crip gang members." Ward Lane Compton Crips graffiti was spray-painted on the rear garage at the property.

In response to a hypothetical based on the facts of the case, Los Angeles County Sergeant Joseph Iberri, a gang officer assigned to the shooting investigation, opined that the shooting was committed for the benefit of, at the direction of, or in association with the Ward Lane Compton Crips because, based on the vehicle's lack of license plates and the victims twice passing the house, the shooter would have believed the car contained rival gang members intent on attacking Ward Lane Compton Crips members. Sergeant Iberri testified the shooting would demonstrate to the community and to rival gangs that the Ward Lane Compton Crips defends its territory and should not be confronted.

### 3. *Fay's testimony*

Fay testified he is a member of the Ward Lane Compton Crips, and had been a member of the gang for three to four years before the shooting. Fay described the residence where the deputies arrested him as a Ward Lane Compton Crips "gang hangout."

When the shooting occurred, Fay was at the house with three other people. Fay had been smoking marijuana, and was standing outside the house scrolling through his cellphone when

someone said, "Watch this car." Fay looked up and saw a black car with tinted windows driving past the residence. Fay returned to his cellphone, and he heard someone say, "Oh, it's turning around, it's turning around." Fay looked up from his cellphone and saw the car coming towards him. He was "not going to sit there and wait for events to unfold"; he "was thinking that, you know, maybe we was going to get shot at" because he "was standing in a gang area that had—this gang, my gang, has enemies." Fay stepped behind a nearby truck, heard gunshots, and ran into the house. His three companions were also in the house; Fay did not know whether they were already in the house when he ran inside or ran inside after he did. Fay never saw the shooter.

The police arrived seven to eight minutes later and ordered Fay and his companions to come outside. Fay was wearing black pants and a white T-shirt with a red emblem on the chest.

Before the trial Fay spoke with someone on the telephone from jail. During the recorded call Fay said, "I am going to get on the stand and I'm going to tell the jury a sob story."

Fay did not know Villamara or Hernandez. Regarding Hernandez, Fay testified, "I don't know that woman. I don't know why she say she—she has seen me before. Most likely, you know, she lives right there. But I don't know her at all."

E.    *The Jury Verdicts and the Sentencing*

The jury convicted Fay on all charges and found the gang and firearm allegations true.

The court sentenced Fay on the attempted murder counts (counts 1, 2 and 3) to three consecutive life terms with a minimum parole eligibility period of 15 years on each count pursuant to section 186.22, subdivision (b)(5), plus a consecutive term of 20 years on count 1 pursuant to section 12022.53, subdivision (c).

9

The court sentenced Fay on count 4 to a concurrent life term pursuant to section 186.22, subdivision (b)(4). The court sentenced Fay on count 5 to a concurrent term of 29 years, consisting of the upper term of nine years pursuant to section 245, subdivision (b), plus 10 years pursuant to section 186.22, subdivision (b)(1)(C), and the upper term of 10 years pursuant to section 12022.5, subdivision (a). The court stayed the firearm enhancements on counts 2, 3 and 4.[5]

Fay timely appealed.

## DISCUSSION

A.  *Double Jeopardy and Collateral Estoppel Did Not Bar Fay's Retrial on the Hung Counts*

Fay argues double jeopardy and collateral estoppel barred his retrial on the five hung counts because in acquitting Fay of assaulting Hernandez and Allison with a semiautomatic firearm, the first jury necessarily found Fay did not shoot at Villamara's car. Fay concedes he did not object on this basis in the trial court. By failing to object, Fay forfeited this issue. (*People v. Gurule* (2002) 28 Cal.4th 557, 646 [defendant's failure to object on double jeopardy grounds before penalty retrial forfeited issue on appeal]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1185 [failure to raise double jeopardy and collateral estoppel in trial court waives those issues on appeal].) Even if Fay had not forfeited this issue, his argument lacks merit.

---

[5]     The court noted at the sentencing hearing that because Fay was under 25 years old when he committed the crimes, he will be eligible for parole after 25 years. (§ 3051, subd. (b)(3).)

10

1. *Applicable law*

The double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 15, of the California Constitution provide that no person may be tried more than once for the same offense.  (*People v. Anderson* (2009) 47 Cal.4th 92, 103-104.)  The double jeopardy clause thus "'protects against a second prosecution for the same offense following an acquittal or conviction, and also protects against multiple punishment for the same offense.'"  (*Ibid.*; see §§ 656, 687.)

This bar generally only prevents repeated prosecution based on "'the same identical act and crime.'"  (*Currier v. Virginia* (2018) __ U.S. __, __ [138 S.Ct. 2144, 2153] (*Currier*), italics omitted.)  In "narrow circumstances" where two offenses involve a common issue of ultimate fact, however, "the retrial of an issue can be considered tantamount to the retrial of an offense," even if the elements of the two offenses differ.  (*Ibid.*; see *Ashe v. Swenson* (1970) 397 U.S. 436, 443-444 (*Ashe*); *Yeager v. United States* (2009) 557 U.S. 110, 119-120 (*Yeager*).)  This principle is derived from the doctrine of collateral estoppel, which provides that when "an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."  (*Ashe*, at p. 443; accord, *Yeager*, at p. 119.)

In a criminal case, the test for establishing a bar against retrial based on collateral estoppel "is a demanding one."  (*Currier*, *supra*, 138 S.Ct. at p. 2150.)  "To say that the second trial is tantamount to a trial of the same offense as the first and thus forbidden by the Double Jeopardy Clause, we must be able to say that 'it would have been *irrational* for the jury' in the first trial to acquit without finding in the defendant's favor on a fact essential to a conviction in the second."  (*Ibid.*)  A second trial is prohibited

11

only if conviction would require the prosecutor to prevail on a factual issue the jury "necessarily" resolved in the defendant's favor in the first trial.  (*Yeager*, *supra*, 557 U.S. at p. 123; accord, *Currier*, *supra*, 138 S.Ct. at p. 2150.)  It is not sufficient that the jury likely acquitted based on the factual issue in question.  (*Ibid.*)

In this analysis courts do not apply the "hypertechnical and archaic approach of a 19th century pleading book."  (*Ashe*, *supra*, 397 U.S. at p. 444.)  A court must "'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'"  (*Ibid.*; accord, *Brown v. Superior Court* (2010) 187 Cal.App.4th 1511, 1524 (*Brown*).)  "If there is to be an inquiry into what the jury decided, the evidence should be confined to 'the points in controversy on the former trial, to the testimony given by the parties, and to the questions submitted to the jury for their consideration.'"  (*Yeager*, *supra*, 557 U.S. at p. 122; accord, *Brown*, at p. 1524.)  "[T]he consideration of hung counts has no place in the issue-preclusion analysis. . . .  To identify what a jury necessarily determined at trial, courts should scrutinize a jury's decisions, not its failures to decide."  (*Yeager*, at p. 122; accord, *Brown*, at p. 1524.)  Our "ultimate focus remains on the practical identity of offenses," i.e., whether a second trial amounts, in practical terms, to a retrial for the same offense.  (*Currier*, *supra*, 138 S.Ct. at p. 2153.)

The defendant bears the burden of establishing facts to prove that a previously rendered judgment of acquittal bars retrial based on double jeopardy principles.  (*Brown*, *supra*, 187 Cal.App.4th at p. 1525; *Bravo-Fernandez v. United States* (2016) 580 U.S. __, __ [137 S.Ct. 352, 365] [defendant bears the burden of

showing that the ultimate issue has been "'determined by a valid and final judgment of acquittal'"].) "When the double jeopardy question requires the trial court to resolve disputed facts, the appellate court reviews the case under the substantial evidence standard. [Citation.] But, when the facts are uncontradicted and different inferences cannot be drawn, the question of former jeopardy is one of law for the court to decide." (*People v. Davis* (2011) 202 Cal.App.4th 429, 438.)

> 2.  *Analysis*

Fay argues the first jury could only have acquitted him of assaulting Hernandez and Allison with a semiautomatic firearm if the jury found Fay did not shoot the gun.[6] Fay further argues that because the two acquitted counts and the five retried counts all required the People to prove Fay shot the gun, double jeopardy and collateral estoppel barred the retrial on the hung counts.

The trial court instructed the jury in the first trial that to convict Faye on each count of assault with a semiautomatic firearm, the People must prove: "1. The defendant did an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and [¶] 4. When the defendant acted, he had the present ability to apply force with a

---

[6]     The verdict forms from the first trial are not in the appellate record. The relevant minute order reflects that the jury acquitted Faye on count 9, which charged him with assaulting Hernandez with a semiautomatic firearm, and count 10, which charged him with assaulting Allison with a semiautomatic firearm.

semiautomatic firearm to a person." Thus, to prove assault with a semiautomatic firearm consistent with the prosecution's theory, the People had to prove Fay shot the gun, i.e., Fay "did an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person."

The People retried Fay on three counts of attempted murder, one count of shooting at an occupied vehicle, and one count of assaulting Villamara with a semiautomatic firearm. Each of these counts also required the People to prove Fay shot the gun. In acquitting Fay of two counts of assault with a semiautomatic firearm, the jury might have concluded Fay did not shoot the gun. Such a finding would mean that the first jury found in Fay's favor on an issue of ultimate fact necessary for conviction on the five retried counts.

For purposes of collateral estoppel, however, it is not sufficient that a jury even likely acquitted based on the factual issue in question. (*Currier*, *supra*, 138 S.Ct. at p. 2150.) A second trial is prohibited only if conviction would require the People to prevail on a factual issue the jury necessarily resolved in Fay's favor in the first trial. (*Yeager*, *supra*, 557 U.S. at p. 123 ["if the possession of insider information was a critical issue of ultimate fact in all of the charges against petitioner, a jury verdict that necessarily decided that issue in his favor protects him from prosecution for any charge for which that is an essential element"].) We cannot conclude based on analysis of the elements of assault with a semiautomatic firearm, and the evidence, arguments, and instructions at the first trial, that the jury necessarily found Fay did not shoot the gun.

The main contested issue at the first trial was Hernandez's identification of Fay as the shooter. One of defense counsel's primary lines of attack on Hernandez's identification of Fay was

14

his argument that it was too dark when the shooting occurred for Hernandez to have identified Fay. Defense counsel argued in his opening statement that the jury must "remember that this incident took place about 8:00 o'clock in the evening. An investigator will come in and he will tell you that he photographed this area at nighttime and there's one streetlight in the area illuminating—poorly illuminating that particular area where the eyewitness identification takes place. It was extremely dark."

Fay testified there was "barely" enough light to see other people outside when the shooting occurred, and that he could not see people more than six feet away. Defense counsel cross-examined Hernandez, Villamara, and a sheriff's deputy about the "very dark" conditions when the shooting occurred. Defense counsel also called an investigator to testify about poor lighting at the scene; at defense counsel's request, the investigator showed the jury photographs the investigator took at the scene under conditions intended to duplicate the dim lighting conditions at the time of the shooting. Defense counsel returned in his closing argument to the theme that it was too dark for Hernandez to have identified Faye: "How well could the witness see the perpetrator? Well, it was 8:00 o'clock at night. It was dark. We've got photographs that were taken in the dark so you'll know how dark it was. You'll see from those photographs that there was one streetlight."

Based on the testimony and other evidence of poor lighting, and defense counsel's argument that Hernandez could not see well enough to identify Fay, the jury reasonably could have concluded it was also too dark for Fay to see Hernandez and Allison in the car. The jury therefore could have found the People did not prove the third element of assault of Hernandez and Allison with a semiautomatic firearm, i.e., "[w]hen the defendant acted, he was

15

aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone."

Other instructions and argument at the first trial also could have caused the jury to reach the conclusion that Fay was unaware Hernandez and Allison were in the car. In addition to instructing the jury on assault with a semiautomatic firearm, the trial court also instructed the jury on the elements of attempted murder. As part of those instructions, the court instructed the jury on the "kill zone" theory: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone. In order to convict the defendant of the attempted murder of Jeymi [*sic*] Hernandez and Allison Hernandez, the People must prove that the defendant not only intended to kill Vincente Villamara, but also either intended to kill Jeymi [*sic*] Hernandez and Allison Hernandez or intended to kill everyone within the kill zone."

In his closing argument, the prosecutor argued no evidence proved Fay knew the car had three occupants when he shot the gun: "[T]here was no evidence that [Fay] really knew exactly who was in the car, but that's part of the problem. [Fay] acted to kill who was in there without knowing who was in the car and that shows still an intent to kill. . . . [Fay] doesn't need to know Allison is in the back of the car. . . . We are not required to prove [Fay] knew every person was in the car."

The prosecutor appeared to be addressing the "kill zone" instruction with this argument. The jury, however, conceivably could have interpreted the prosecutor's statement that "there was no evidence that [Fay] really knew exactly who was in the car" to mean that when Fay shot at the car, he did not know Hernandez and Allison were in the car, and thus Fay did not realize that his

16

act of shooting would directly and probably result in the application of force to Hernandez and Allison.

In sum, based on the evidence and argument presented at the first trial, the jury reasonably could have concluded the People proved Fay shot the gun, but did not prove that when Fay shot the gun he knew Hernandez and Allison were in the car, or he was aware of facts that would cause a reasonable person to realize the car had occupants other than Villamara. (See *People v. Felix* (2009) 172 Cal.App.4th 1618, 1628 [defendant may be guilty of assault if he has actual knowledge of facts sufficient to establish his act will directly and probably result in application of force to someone, or intent to do act which will injure any reasonably foreseeable person].) We therefore cannot conclude it would have been irrational for the jury to acquit Fay of assaulting Hernandez and Allison with a semiautomatic firearm without finding he did not shoot the gun. (See *Currier*, *supra*, 138 S.Ct. at p. 2150.) Because the jury did not necessarily decide Fay did not shoot the gun, double jeopardy and collateral estoppel did not bar Fay's retrial on the hung counts.

B.  *The Trial Court Did Not Err in Denying Fay's Motion To Dismiss the Information Based on Vindictive Prosecution*

1.  *Applicable law*

The due process clauses of both the federal and state Constitutions prohibit the People from increasing charges against a criminal defendant in retaliation for the defendant's exercise of a constitutional right. (*People v. Jurado* (2006) 38 Cal.4th 72, 98.) "A vindictive prosecution claim may be established "'by producing direct evidence of the prosecutor's punitive motivation.'"" (*Short v. Superior Court* (2019) 42 Cal.App.5th 905, 915 (*Short*); accord,

17

*United States v. Goodwin* (1982) 457 U.S. 368, 380-381, 384
(*Goodwin*).)

In the absence of direct evidence, a defendant may raise a presumption of vindictiveness by making a prima facie showing that the prosecutor's actions raise a "reasonable likelihood of vindictiveness." (*Twiggs v. Superior Court* (1983) 34 Cal.3d 360, 373 (*Twiggs*); accord, *Goodwin*, *supra*, 457 U.S. at p. 373.) "[A]n inference of vindictive prosecution is raised if, upon retrial after a successful appeal, the prosecution increases the charges so that the defendant faces a sentence potentially more severe than the sentence he or she faced at the first trial." (*People v. Ledesma* (2006) 39 Cal.4th 641, 731 (*Ledesma*).) Similarly, under California law, a presumption of vindictiveness is raised where the prosecutor adds additional charges, which subject the defendant to greater potential liability, after a mistrial. (*In re Bower* (1985) 38 Cal.3d 865, 873 (*Bower*); accord, *Twiggs*, *supra*, 34 Cal.3d at pp. 368-370 [finding reasonable likelihood of vindictiveness where charges are increased following mistrial due to deadlocked jury]; but see *U.S. v. Thomas* (10th Cir. 2005) 410 F.3d 1235, 1247 [addition of charges due to mistrial following a hung jury does not raise presumption of vindictiveness].)

"In order to rebut the presumption of vindictiveness, the prosecution must demonstrate that (1) the increase in charge was justified by some objective change in circumstances or in the state of the evidence which legitimately influenced the charging process and (2) that the new information could not reasonably have been discovered at the time the prosecution exercised its discretion to bring the original charge." (*Bower*, *supra*, 38 Cal.3d at p. 879; accord, *Blackledge v. Perry* (1974) 417 U.S. 21, 29, fn. 7; see also *Robinson v. Superior Court* (1986) 181 Cal.App.3d 746, 749 ["The presumption of vindictive prosecution may be rebutted with 'an

18

explanation that adequately eliminates actual vindictiveness' [citation], or by proving 'that the increase in the severity of the charges did not result from any vindictive motive' [citation], or that the more severe charge was 'justified by independent reasons or intervening circumstances which dispel the appearance of vindictiveness.'"].)

The Supreme Court has not determined the standard of review for a claim of vindictive prosecution. (See *People v. Ayala* (2000) 23 Cal.4th 225, 299 [rejecting the defendant's claim of vindictive prosecution "under any standard of review"].) We, like other appellate courts, review the trial court's factual findings for substantial evidence and its legal determination de novo. (*Short*, *supra*, 42 Cal.App.5th at p. 915.)

2. *Relevant proceedings*

a. *Fay's motion to dismiss the information and the People's opposition*

Fay moved before the retrial to dismiss the information in case number TA146912 for vindictive prosecution based on the People's addition of gang allegations on each hung count. Fay asserted the People had long known of his gang membership, but only added the gang allegations after the mistrial to penalize Fay for exercising his right to a jury trial. Fay argued the information should be dismissed because the gang allegations increased Fay's maximum exposure in the retrial.

The People opposed Fay's motion. The People argued no presumption of vindictive prosecution arose because Fay faced less prison time in the retrial than he had in the prior case because the People did not file charges in case number TA146912 related to the second shooting. The People also argued that if a presumption of

19

vindictiveness had arisen, the People had rebutted the presumption.

The People submitted a declaration from the prosecutor in support of their opposition.[7]  He stated that a district attorney investigator informed him after the preliminary hearing in case number TA142782 that Villamara and Hernandez had been located living out of state.  Because Villamara and Hernandez had been located, the district attorney's office dismissed case number TA142782 and refiled the case under case number TA145605 so a second preliminary hearing could be held at which Villamara and Hernandez would testify.

The prosecutor stated that he met Villamara and Hernandez for the first time on the day of the preliminary hearing; Villamara's and Hernandez's testimony at the preliminary hearing was the first time they had testified about the shooting.[8] According to the prosecutor's declaration, Villamara and Hernandez "provided greater detail than in the police reports about the path of travel of their vehicle."  Villamara's and Hernandez's testimony "caused [the prosecutor] to believe for the first time that [Fay's] motive for the shooting was that he thought the victims' vehicle was turning around to commit a drive by shooting against him because he was a Ward Lane Compton Crip standing in front of a known hangout."

---

[7]     The only evidence submitted in connection with the motion to dismiss for vindictive prosecution was the prosecutor's declaration and its exhibits.

[8]     The People stated Villamara and Hernandez came from out of state to testify at the preliminary hearing without requiring subpoenas.

The People argued that because the prosecutor did not know until midway through the preliminary hearing that Villamara had driven past the residence twice before the shooting, and thus did not know until the preliminary hearing that the shooting could be gang-motivated, the People had not charged gang allegations in case number TA145605 and did not have necessary gang-specific evidence available to introduce at the preliminary hearing. The People argued they thus "were confronted with two imperfect options": (i) dismiss case number TA145605 and refile the case again to add gang allegations, "but risk being unable to locate [Villamara and Hernandez] for trial and being stuck without the option of refiling" because the new case would be the third filing; or (ii) proceed on the charges in case number TA145605 and attempt to introduce evidence of gang motive without charged gang allegations. Having concluded that "the risks associated with filing for a third time and being unable to locate [Villamara and Hernandez] w[ere] too high," the People proceeded to trial in case number TA145605 "with hopes that the trial court would understand the relevance of the gang evidence and it would be admitted without a charged gang enhancement."

b. *The trial court excludes the gang evidence in the first trial*

At the outset of the trial in case number TA145605, the prosecutor informed the court that Fay was a Ward Lane Compton Crip. The prosecutor stated he did not "at th[at] point" plan to present evidence about Fay's gang membership, but "it could be relevant to motive" depending on the defense's argument "as to what [Fay's] motive was, lack of motive and such."

The trial court responded: "As the court indicated yesterday off the record, I'll indicate again, there's no gang allegation. There

21

is to be no discussion of gangs. . . . [¶] And as of right now since there is no gang allegation, the court is not going to allow any mention from either side of any gang graffiti, gang activity, gang affiliation or anything related to gangs. . . . [¶] The court is making a ruling that neither side is to make any mention of any gang affiliation, activity or anything related to gangs. This is not—it has not been charged as a gang crime and, therefore, it's not relevant."

The trial court reiterated its ruling later in the trial: "There's information the court was aware of because I had an earlier 402 hearing that Mr. Fay is associated with a physical [*sic*] gang. That this house was an alleged gang hang-out. During a search warrant, they found gang graffiti in the house. And I was aware of all that because I ultimately made a ruling since there was no gang allegation, that the People are prevented from eliciting any testimony relating to gangs."

In discussing the admission of excerpts of a recorded jail call, the court repeated its ruling: "Although these excerpts will be allowed in and both sides can make whatever argument they feel necessary, this does not allow either side to go against my previous ruling which [is] because there's no gang allegations there will be no mention of any affiliation of any gangs by Mr. Fay nor any other argument regarding gangs."

Following the court's ruling, Fay testified in the first trial that he had been on his way to a liquor store to purchase marijuana when he "came across the dudes [he] went to school with, they said [they had] some weed [they] could smoke, so [they] smoked. And then that situation [the shooting] happened." Fay explained that he "was chillin', talkin' with them and reminiscing" when he "heard somebody say[,] 'watch this car,' and the car drove by." Fay continued, "It kept going so I didn't pay it no nevermind.

22

Then it made a U-turn and I heard somebody scream[,] 'It's coming back. It's coming back.' Then my heart dropped and I heard shots and I squatted. There was a car in the way so I squatted, and then I continued to hear shots so I ran into the house." Fay testified he thought the shots were coming from the car.

The court declared a mistrial on the hung counts on July 18, 2018. In his declaration in opposition to Fay's motion to dismiss, the prosecutor stated that on or about August 22, 2018, he received a supplemental report from Deputy Strollo in which she provided information about the Ward Lane Compton Crips and opined that Fay shot at Villamara's car because Fay believed the car contained rival gang members. After receiving Deputy Strollo's supplemental report, the prosecutor refiled the case with gang allegations under case number TA146912.

      c.      *The trial court denies Fay's motion to dismiss the information for vindictive prosecution*

The trial court denied Fay's motion to dismiss the information in case number TA146912 for vindictive prosecution. The court commented that the prosecutor "made certain strategic decisions on what to go forward on. Based on the preliminary hearing [in case number TA145605] he was limited on what[,] he couldn't go forward on the gang allegation because it wasn't proven up at prelim or it was dismissed at prelim. And things get dismissed for a variety of reasons, . . . in this case not having a predicate available.[9] But after that case, the results that

_____

[9] The People did not charge gang allegations in case number TA145605, and thus no gang allegations were dismissed in that case.

23

happened, it was hung and then the People decided to refile the case. They have a right to refile it after a hung jury."

The court did not address the standard applied to vindictive prosecution claims. The court observed that Fay had been held to answer on the gang allegations following the preliminary hearing in case number TA146912. The court ruled, "[T]he People have a right to file charges that they believe they can prove up in front of the jury. And ultimately the jury will decide whether [the prosecutor] can prove up the charges and allegations he's bringing forth."

3.   *Analysis*

Fay's vindictive prosecution claim is not premised on direct evidence of the prosecutor's allegedly punitive motivation. Thus, we must determine whether the gang allegations gave rise to an unrebutted presumption of vindictiveness.

Faye contends a presumption of vindictiveness arose because the gang allegations increased his potential exposure in the retrial. The People argue no presumption arose because Fay faced fewer charges and less prison time on retrial because the People did not refile the three dismissed counts related to the second shooting, which included an attempted murder charge carrying a potential life sentence.

The People dismissed the three counts related to the alleged second shooting before the prior trial began. The People cite no authority holding that charges dismissed before trial constitute charges "at the first trial" (*Ledesma, supra*, 39 Cal.4th at p. 731) for purposes of a vindictive prosecution analysis. (See *Bower, supra*, 38 Cal.3d at p. 877 [presumption of vindictiveness applies in cases involving retrial after mistrial because "[a]s in the cases involving retrial after appeal . . . jeopardy ha[s] attached"].)

24

Adding gang allegations to each hung count exposed Fay to sentence enhancements pursuant to section 186.22, thereby increasing the potential prison time Fay faced in the retrial. A presumption of vindictiveness thus arose. (*Bower*, at p. 873.)

The People rebutted the presumption, however. The People did not locate Villamara and Hernandez living out of state until after the preliminary hearing in case number TA142782. Upon locating them, the People dismissed case number TA142782 and refiled the case under case number TA145605 so Villamara and Hernandez could testify at the preliminary hearing, which was the first time they testified about the shooting. According to the prosecutor's uncontroverted declaration, during their testimony Villamara and Hernandez provided more detail about their vehicle's path than the prosecutor had previously known— specifically, that Villamara had driven past the Ward Lane Compton Crips "hangout" twice before the shooting—which caused the prosecutor to conclude the shooting was gang-motivated. Because the prosecutor had been unaware of this information before the preliminary hearing, the People had not charged gang allegations in case number TA145605, and the People did not have gang-specific evidence prepared to introduce at the preliminary hearing.

Concerned about Villamara's and Hernandez's availability, and having already once refiled the case, the People chose to proceed to trial on the charges in the information in case number TA145605. The prosecutor raised with the trial court the possibility the People might seek to introduce evidence supporting a gang motive for the shooting. The court ruled that because the People had not charged gang allegations, no gang evidence would be admitted. The People thus could not in the first trial present evidence of Fay's gang membership, or evidence that the house in

front of which the shooting occurred, and where deputies arrested Fay, was a known "gang hangout." Nor could the People argue Fay shot at Villamara's car because he thought the car contained rival gang members intending to attack West Lane Compton Crips. With the gang evidence excluded, Fay testified in the first trial that the shooting randomly occurred during an impromptu get-together of school acquaintances at a neighborhood house. After Fay's explanation for his presence at the shooting site seemingly persuaded several jurors in the first trial, the prosecutor obtained a supplemental report that supported charging gang allegations, and refiled the case with gang allegations to ensure the gang motive evidence would be admitted in the retrial.

These events rebut any presumption the prosecutor added the gang allegations to retaliate against Fay for exercising his right to a jury trial, or any other constitutional right. The record reflects the prosecutor charged the gang allegations after hearing Villamara's and Hernandez's testimony during the preliminary hearing in the prior case, electing to proceed to trial without charging gang allegations due to legitimate concerns about Villamara's and Hernandez's availability and the case status, and having been precluded from introducing gang motive evidence in the first trial because gang allegations had not been charged. The trial court did not err in denying Fay's motion to dismiss the information in case number TA146912 for vindictive prosecution.

## DISPOSITION

The judgment is affirmed.


McCORMICK, J.*


We concur:


PERLUSS, P. J.


SEGAL, J.

---

*        Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.